871 F.2d 1054
 10 ITRD 2546, 10 U.S.P.Q.2d 1257
 TEXAS INSTRUMENTS INCORPORATED, Appellant,
v.
UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee,
and
Samsung Company, Limited, and Samsung Semiconductor &
Telecommunications Co., Limited, Intervenors.
SAMSUNG COMPANY, LIMITED, and Samsung Semiconductor &
Telecommunications Company, Limited, Appellants,
v.
UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee,
and
Texas Instruments Incorporated, Intervenor.
 Nos. 88-1090, 88-1177.
 United States Court of Appeals,
Federal Circuit.
 March 28, 1989.
As Amended May 23, 1989.
Rehearing Denied in No. 88-1090 May 26, 1989.
 
 Hal D. Cooper, of Jones, Day, Reavis & Pogue, Cleveland, Ohio, argued for appellant in No. 88-1090. With him on the brief were Robert C. Kahrl, James L. Wamsley, III, and Leonard L. Lewis.
 Thomas O'Connell, Office of the General Counsel, ITC, Washington, D.C., argued for appellee in No. 88-1090. With him on the brief were Michael J. Buchenhorner, Lyn M. Schlitt, General Counsel and James A. Toupin, Asst. General Counsel.
 William K. West, Jr., of Cushman, Darby & Cushman, Washington, D.C., argued for intervenors in No. 88-1090. With him on the brief were Michael L. Keller, Charles R. Donohoe, Peter W. Gowdey, Lawrence Harbin and John E. Gartman.
 William K. West, Jr., of Cushman, Darby & Cushman, Washington, D.C., argued for appellants in No. 88-1177. With him on the brief were Charles R. Donohoe, Lawrence Harbin and John E. Gartman.
 Michael J. Buchenhorner, Office of the General Counsel, ITC, Washington, D.C., argued for appellee in No. 88-1177. With him on the brief were Thomas O'Connell, Lyn M. Schlitt, General Counsel and James A. Toupin, Asst. General Counsel.
 Robert C. Kahrl, of Jones, Day, Reavis & Pogue, Cleveland, Ohio, argued for intervenor in No. 88-1177. With him on the brief were Hal D. Cooper, James L. Wamsley, III, and Leonard L. Lewis.
 Before FRIEDMAN, BISSELL, and MAYER, Circuit Judges.
 FRIEDMAN, Circuit Judge.
 
 
 1
 These are appeals from determinations by the International Trade Commission (Commission) of the validity and infringement of various claims of four patents owned by Texas Instruments, Inc., that cover computer components or their manufacture. The infringing products were manufactured in Korea and imported into the United States by Samsung Co., Ltd., and Samsung Semiconductor and Telecommunications Co., Ltd. (collectively, Samsung). Since both appeals are from various portions of a single Commission decision and involve the same technology and closely related claims, we decide both appeals in this opinion. We affirm in part, reverse in part, and vacate in part.
 
 
 2
 * A. The Commission Proceedings.
 
 
 3
 In February 1986, Texas Instruments filed with the Commission a complaint against 19 respondents alleging that they had violated section 337 of the Tariff Act of 1930, 19 U.S.C. Secs. 1337, 1337a (1982), by importing into and selling in the United States computer components that infringed 10 of Texas Instruments' patents. The Commission instituted an investigation of the complaint. During the ensuing Commission proceedings, 17 of the 19 respondents either settled with Texas Instruments or the investigation was terminated with respect to them. Only the charges against Samsung are involved in this appeal.
 
 
 4
 After extensive hearings, the administrative law judge (ALJ) rendered an initial decision of 800 pages (the longest initial decision in the Commission's history). In the Matter of Certain DRAMs, Inv. No. 337-TA-242, Initial Determination (USITC May 21, 1987) (hereinafter "ALJ Report"). Texas Instruments' case against Samsung was based on Samsung's alleged infringement of five Texas Instruments patents: U.S. Patent Nos. 3,716,764 (the '764 patent), 3,940,747 (the '747 patent), 4,081,701 (the '701 patent), 4,533,843 (the '843 patent), and 4,543,500 (the '500 patent). The ALJ held that Samsung had infringed the '764, the '701, and the '843 patents, and had not shown that those patents were invalid; that Samsung had not infringed the '747 patent; and that the '500 patent was unenforceable because Texas Instruments had engaged in misconduct before the Commission during the discovery phase of the proceeding.
 
 
 5
 The Commission granted review of certain portions of the initial decision. In a 98-page opinion the Commission affirmed-in-part and reversed-in-part the ALJ's decision. Certain Dynamic Random Access Memories, Etc., USITC Pub. 2034, Inv. No. 337-TA-242 (Nov. 1987) (Commission opinion on Violation, Remedy, Bonding, and Public Interest, hereinafter "ITC opin."). The Commission held: (1) the '764 patent was valid but Samsung had not infringed it; (2) Samsung had not infringed the '747 patent; (3) Samsung had infringed the '701 patent; (4) the '843 patent was valid and Samsung had infringed it; and (5) the '500 patent was valid and enforceable, and Samsung had infringed it.
 
 
 6
 The Commission declined to issue a general exclusion order barring the importation of all infringing devices, or a cease-and-desist order. It issued a limited exclusion order that barred only importation of particular components (and computers containing those components) manufactured by Samsung that infringed specified claims of the '701, '500, or '843 patents.
 
 
 7
 B. The Commission Decision.
 
 
 8
 As indicated, Texas Instruments contended that Samsung's computer components infringed five of its patents. The Commission found that Samsung had infringed three of the patents ('701, '843, and '500), and that Samsung had not infringed the two other patents ('764 and '747).
 
 
 9
 Since the determination of noninfringement of the '747 patent is not challenged in these appeals, we do not discuss that patent.
 
 
 10
 1. The '701 Patent. The claims of this patent here at issue cover a sense amplifier within a memory device that has an improved method of reading the memory circuit so as to increase the speed of the circuit with minimal electrical power loss. The Commission rejected Samsung's contention that the patent was invalid because another person (Puar) had made the invention before the inventor named in the patent. The Commission held that three of the Samsung computer components known as the 64K, 128K, and 256K DRAMs, infringed the '701 patent.
 
 
 11
 A DRAM is a memory device in a computer in which information is stored and from which it is retrieved. It is an acronym for dynamic random access memory. "K" represents the potential amount of memory stored in the DRAM. Each kilobyte, or K, constitutes 1,024 units of memory. Thus, the Samsung 64K DRAM could store 65,536 units of memory. We refer to the Samsung 64K, 128K, and 256K DRAMs collectively as the "Samsung DRAMs."
 
 
 12
 The Commission found, and Samsung concedes, that Samsung manufactured its 128K DRAM by combining two 64K DRAMs and that the Commission rulings and actions with respect to the 64K DRAM are equally applicable to the 128K DRAM.
 
 
 13
 2. The '843 Patent. This patent covers supplying a boost amplification to a computer to refresh the memory circuit prior to reading of the memory circuit contents. The Commission held that the Samsung 256K DRAM, but not the 64K and 128K DRAMs, infringed claims 6 or 7 of this patent.
 
 
 14
 3. The '500 Patent. This patent also covers supplying a boost voltage to a memory circuit prior to reading. The ALJ had held this patent unenforceable because Texas Instruments had engaged in improper conduct during the Commission proceedings. The Commission reversed that ruling and held that the patent was valid and that the Samsung 256K DRAM infringed claims 6 and 7 of the patent (the only claims Texas Instruments alleged were infringed). (The ALJ had found that the Samsung 64K and 128K DRAMs did not infringe those claims and Texas Instruments did not appeal that ruling to the Commission.)
 
 
 15
 4. The '764 Patent. Texas Instruments alleged that the Samsung DRAMs infringed claims 16, 17, and 19 of this patent. Those claims cover a technique for rapid and inexpensive encapsulation in plastic of electrical components. The ALJ found that the Samsung DRAMs infringed those claims, but the Commission reversed. The reversal rested on the Commission's interpretation of three limitations that were present in each of those claims.
 
 
 16
 A more detailed description of the claims and analyses of the legal rulings of the Commission is set forth in parts II and III of this opinion.
 
 
 17
 C. The Present Appeals.
 
 
 18
 In its appeal in No. 88-1090, Texas Instruments challenges the Commission's determination that Samsung's DRAMs did not infringe the '764 patent and that Samsung's 64K and 128K DRAMs did not infringe the '843 patent. In its appeal in No. 88-1177, Samsung argues that the Commission erred in upholding the validity of the '701, '843, and '500 patents, in reversing the ALJ's ruling that the '500 patent was unenforceable and in finding that the Samsung DRAMs infringed the '701 patent. Because of the nature of the issues involved in the two appeals, we discuss Samsung's appeal first.
 
 II
 Samsung's Appeal in No. 88-1177
 
 19
 A. The '701 Patent.
 
 
 20
 1. Validity.
 
 
 21
 When the '701 patent was issued in 1978 to the named inventors, White, et al. (collectively, White), Puar had pending an application for a patent covering the same or a similar device. The examiner rejected claims 4-7 and 10 in the Puar application in view of the '701 patent. Asserting that he and not White was the first inventor of the invention the '701 patent covered, Puar copied two claims of the '701 patent, which covered a sense amplifier in a memory device. He thereby provoked an interference between himself and White.
 
 
 22
 Since White had filed his patent application prior to Puar's filing date, to prevail in the interference Puar was initially required to show that he conceived the invention or reduced it to practice prior to White's filing date. The Board of Patent Interferences (Board) held that Puar could not demonstrate prior actual reduction to practice of the invention of the count because his product could not "operate successfully in any practical use." ALJ Report at 320. The Board ruled that Puar had established a conception date of "no later than December 18, 1975," which was before White's conception date of January 31, 1976. ALJ Report at 319. The Board, however, awarded priority of invention to White because Puar had not shown his own reasonable diligence from just prior to White's conception date to his own filing date.
 
 
 23
 After losing the interference, Puar continued his ex parte prosecution of his application. Puar was granted U.S. Patent No. 4,508,980 ('980), containing claims for a sense amplifier that were not involved in the interference.
 
 
 24
 Samsung contended before the ALJ that there is no patentable distinction between the inventions of the '980 and the '701 patents, that the ALJ therefore should conduct a new investigation of priority of invention between White and Puar, and that if the Commission found that Puar was the first to invent, as defined by section 102(g), then the '701 patent would be invalid. The ALJ accepted this argument, stating:
 
 
 25
 The Board's decision created a dilemma because the sense amplifier ['980] and the sense amplifier in the memory system ['701] are not patentably distinct. Either Puar or TI should have requested clarification or appealed the decision so that the parties could be sure who had been awarded priority on the "invention" that was common to the memory system of White and the sense amplifier of Puar. Either party could have put this issue before the Board. The Board's dictum indicates that priority would have been awarded to Puar.
 
 
 26
 ALJ Report at 324-25. The ALJ thus found that the Board had used an improper interference count, since the count should have covered the sense amplifier alone rather than a sense amplifier in a memory device. The ALJ stated:
 
 
 27
 In this case the count did not define the common invention. The common invention was the sense amplifier. The count referred to the sense amplifier in a memory device.
 
 
 28
 ALJ Report at 316.
 
 
 29
 The ALJ then undertook to determine priority of invention between White and Puar with respect to the sense amplifier alone. Upon a review of the evidence before her which she set forth in detail, she concluded that White was entitled to priority because Puar had not exercised reasonable diligence during the period from just before White's conception date to his own filing date. The Commission did not review that determination; it therefore became the decision of the Commission.
 
 
 30
 In its appeal, Samsung repeats its argument that Puar and not White was the first inventor of the invention the '701 patent covers, and it contends that the Commission therefore erred in not holding that the '701 patent is invalid. We hold, however, that the Commission's finding that Puar had not exercised reasonable diligence with respect to the sense amplifier alone is supported by substantial evidence. This conclusion requires rejection of Samsung's contention, since whether the invention of the '701 patent is viewed as the sense amplifier alone or the sense amplifier in the memory device, Puar was not the first inventor of it.
 
 
 31
 2. Infringement.
 
 
 32
 Samsung's challenge to the Commission's findings that the Samsung DRAMs do not infringe the '701 patent requires examination of the language of the claims. Insofar as here pertinent, claim 1 specifies the improvement as
 
 
 33
 a pair of switching devices each connected to discharge the gate of one of the load transistors, each of the switching devices having a source-to-drain path and a gate and a selected voltage applied to their gates which is less than said supply voltage, coupling means for applying a voltage to the gates of the load transistors sufficient to turn on the load transistors at a selected time, and means for precharging the column lines prior to said selected time.
 
 
 34
 In less scientific terminology, this claim specifies a pair of amplifying transistors, or devices, which are each connected to the amplifier which senses, or loads, the information stored in the memory circuit. This accessory pair of devices can be opened or closed through timed gates, thereby permitting the addition of extra power to one end of the sensing transistor. The final element of the improvement specifies some means for assuring that the memory circuit is at a level precharge prior to initial reading.
 
 
 35
 Asserted claims 2-6 are dependent upon claim 1 and contain, by reference, these limitations.
 
 
 36
 Samsung contends that the Commission's decision rests upon two misinterpretations of the claim. First, it argues that the high voltage that its DRAMs supplied to the load transistor's gates is not "less than said supply voltage," as claim 1 requires. According to Samsung, the Commission mistakenly relied upon a chart prepared by Texas Instruments in finding that the Samsung DRAMs embodied this limitation of the claim.
 
 
 37
 The Commission specifically discussed and rejected this contention. The Commission noted that expert testimony was presented on the issue whether the Samsung devices used a selected voltage that was less than the supply voltage at these gates. Texas Instruments' expert Hodges testified about the 64K DRAM: "I notice that [the voltage is] at less than full level for quite some time.... And so during the time that it's functioning to discharge the gate of the load transistor's, it is at a less than supply level." Trial Transcript at 9758. There was similar testimony concerning the 256K DRAM. Samsung does not contend that this direct testimony was inaccurate, only that the charts were mislabeled. In finding infringement of this limitation of the claim, the Commission relied, not upon the chart, but upon expert testimony that it credited.
 
 
 38
 Samsung's second contention is that its 64K DRAMs do not contain a "means for precharging" as recited in claim 1. Means-plus-function claims "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. Sec. 112, p 6. The specification of the '701 patent is largely directed toward the major point of novelty--the use of two sequential transistors to provide amplification with a maximum of both speed and power conservation. However, column 5, lines 39-42 states:
 
 
 39
 During phi baseline, seen in Fig. 4a, the lines 37 and 38 are being precharged while phi 1 and phi 2 are zero and phi 3 is high; at this time the nodes 61 and 62 are being precharged to about (Vdd--2Vt) or the maximum level 68 of phi 3 minus Vt and the nodes 35 and 36 will be charged to Vref.
 
 
 40
 The means recited is a precharging equalization of the bit lines at nodes prior to reading. There were many techniques available to those skilled in the art to provide for this equalization, either by shorting together the bit lines or by precharging with separate transistors. Since these equivalents were available in the art, Samsung had only to select a means after learning the principle from the White, et al., teachings. The Commission correctly found that Samsung's equalization of the bit lines by shorting them together, followed by the use of electrical components to keep "the voltage once it is established," infringed the means-for-precharging limitation of claim 1. See Karp testimony at part III-A-2.
 
 
 41
 We therefore uphold the Commission's finding that the Samsung DRAMs infringe claims 1, 2, 3, and 6, of the '701 patent. Those findings of infringement fully support the Commission's exclusion order based on infringement of that patent, which expires in 1995. We therefore find it unnecessary to consider Samsung's contention that the record contains no evidence to support the Commission's finding that the Samsung DRAMs also infringe claims 4 or 5 of the '701 patent. We shall vacate the latter finding.
 
 
 42
 B. The '843 Patent.
 
 
 43
 The Commission found that Samsung's 256K DRAM infringed claims 6 and 7 of the '843 patent, which expires in 1997. Those claims cover a semiconductor memory device with multiple memory storage sites and a sense amplifier which can read the stored information. Both claims include a means for applying a boosting voltage to the address line prior to a reading by the sense amplifier. The boost functions to refresh the voltage stored in the memory cells.
 
 
 44
 Samsung contends that the Commission should have invalidated the '843 patent because (1) the specification did not state the best mode of practicing the invention, (2) the specification does not adequately describe the invention, (3) the claims are indefinite, and (4) the invention the patent disclosed would have been obvious.
 
 
 45
 1. Best Mode.
 
 
 46
 Samsung argues that the specification did not state the best mode for boosting the wordline voltage because it did not state any mode for doing that. In Hybritech v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384-85, 231 USPQ 81, 94 (Fed.Cir.1986), we stated:
 
 
 47
 Because not complying with the best mode requirement amounts to concealing the preferred mode contemplated by the applicant at the time of filing, in order to find the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than he disclosed.
 
 
 48
 Samsung's admission in its brief that the inventors themselves did not consider the "word boost" feature to be part of the best mode of their invention refutes any argument that the inventor "knew of and concealed a better mode than he disclosed."
 
 
 49
 Moreover, the patent specification does disclose a mode for boosting the address voltage to a "magnitude substantially higher than said supply voltage." ' 843 Patent, column 7, lines 44-45, claim 6. For example, at column 5, lines 19-26, the specification adequately describes the boosting of the address lines to "a level of Vdd + Vt to permit restoration of a full Vdd level in the" memory cell. Figure 4, trace (a), depicting the timing and voltage on the row line, demonstrates the exact point at which the boost above Vdd occurs. In re Barker, 559 F.2d 588, 593, 194 USPQ 470, 474 (CCPA 1977) (drawings may be included in considering compliance with description requirement). In addition, the applicant overcame any suggestion that boosting circuitry was not adequately disclosed. See part II-B-3.
 
 
 50
 The fact that Texas Instruments may have manufactured a DRAM containing a different or better form of boosting means is not pertinent to whether the specification disclosed "the best mode contemplated by the inventor in carrying out his invention." Sec. 112, 1st para. The ALJ found that "[t]he record does not disclose that the applicant knew of or concealed a better mode than he disclosed," ALJ report at 463, and the Commission adopted this finding. ITC opin. at 46. The finding is supported by substantial evidence and is dispositive of Samsung's best mode argument.
 
 
 51
 2. Description.
 
 
 52
 The description requirement in the first paragraph of section 112 requires that the specification contain
 
 
 53
 a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same....
 
 
 54
 The ALJ found in the alternative that the addition during the prosecution of the '843 patent of claim language requiring precharging to a "selected voltage" that was not the supply voltage added a claim that described an invention not in the possession of the inventor at the time of filing. The ALJ stated:
 
 
 55
 The patent disclosure did not reasonably convey to the artisan that the inventor had possession at that time of the midpoint charging or sensing concept.
 
 
 56
 ALJ Report at 425-26.
 
 As we recently noted:
 
 57
 When the scope of a claim has been changed by amendment in such a way as to justify an assertion that it is directed to a different invention than was the original claim, it is proper to inquire whether the newly claimed subject matter was described in the patent application when filed as the invention of the applicant.
 
 
 58
 In re Richard Wright, 866 F.2d 422, 424, 9 USPQ2d 1649, 1651 (Fed.Cir.1988) (emphasis in original).
 
 
 59
 This is the essence of the description requirement of section 112, first paragraph: whether one skilled in the art, familiar with the practice of the art at the time of the filing date, could reasonably have found the "later" claimed invention in the specification as filed.
 
 
 60
 The examiner of the application that matured into the '843 patent recognized that the point of novelty was the "word boost" feature. ALJ Report at 389. He stated: "The point of novelty is ... the limitation raising the row voltage level higher than the supply level." ' 843 Patent Prosecution History at 34.
 
 
 61
 The ALJ recognized that those skilled in the art were able to construct circuits with mid-point precharging, without referring to the specification of the '843 patent. The ALJ stated:
 
 
 62
 The concept of midpoint precharging was suggested in an article entitled "Peripheral Circuit for One-Transistor Cell MOS RAMs" by Foss and Harland published in the IEEE Journal of Solid State Circuits, Vol. SE-10, No. 5, October 1975. The DRAM described in the Foss et al. article includes sense amplifiers and an array of rows and columns of one transistor memory cells at a face of a semiconductor body.
 
 
 63
 ALJ Report at 430. The ALJ held the Foss article to be pertinent prior art under section 102(b). The Foss article was published nearly three years prior to the filing date of the specification of the '843 patent. Foss testified that one could use the disclosure of the '843 patent specification to provide midpoint precharging, but that the designer "would approach it from a fresh design standpoint." Trial Transcript at 11,208. The fact that one skilled in the art would be able to construct the invention "from a fresh design standpoint" by referring to standard textual materials or other well-known references does not establish that the inventor was not possessed of the claimed subject matter--a sense amplifier with a word boost feature which also included midpoint precharging.
 
 
 64
 The ALJ found, and the Commission adopted the finding, that claims 6 and 7 of the '843 patent were alternatively invalid because they included new matter. ITC opin. at 46. "New matter" rejections are properly reviewed under Sec. 112, first paragraph. In re Rasmussen, 650 F.2d 1212, 1214, 211 USPQ 323, 325 (CCPA 1981). The ALJ's finding that the claims are alternatively invalid for failure to meet the description requirement of section 112 if properly construed is not supported by substantial evidence. (See part III-A-1 for discussion of claim construction.) We therefore reverse it.
 
 
 65
 3. Indefiniteness.
 
 
 66
 Samsung contends that the failure of the claims to set forth a specific circuit or means for supplying the boosting voltage to the row line, as depicted in figure 4 of the patent, constituted a failure to "particularly point out and distinctly claim" the subject matter of the invention, as the second sentence of section 112 requires. It contends that because the boosting feature claim is in means-plus-function form, the claim is indefinite since there is no "structure" disclosed in the specification for which equivalents could be determined. The examiner initially rejected the claims of the application for the '500 patent, of which the '843 patent application was a continuation, for this very reason. The examiner stated:
 
 
 67
 With respect to the limitations in claims 1, 11 and 12, as described in the paragraph above, for effecting a complete replenishing of the storage cell voltage levels, applicants' description in the specification requires the timely operation of the pull-up circuitry, e.g., elements 67-73. Thus the claims are deemed indefinite as a result of being incomplete.
 
 
 68
 '500 Patent Prosecution History at 29-30. The applicant submitted remarks explaining the claim limitation as follows:
 
 
 69
 It is submitted that a person skilled in the art could practice the invention based on the disclosure, without resort to experimentation. The control circuit 37 generates the various clock voltages of Fig. 4 based upon the inputs RAS, CAS and W (see p. 4, lines 19-26). The desired shape of the waveform in question is shown in Fig. 4a. When Pb goes high as seen in Fig. 4d, the row line voltage is boosted as seen in Fig. 4a (see p. 8, line 6). At the time of filing the application there were circuits well known in this art for booting [sic] a node to a value above the supply voltage level.
 
 
 70
 '500 Patent Prosecution History at 36-37. The applicant then described an example of just such a circuit given in the specification at column 5, lines 31-32 (column 5, lines 35-36, in the '843 patent) as applied to a different node. The applicant also referred to three prior patents that described such circuits, stating that these types were well known in the art.
 
 
 71
 The public is entitled to know the scope of the claims but must look to both the patent specification and the prosecution history, especially where there is doubt concerning the scope of the claims. McGill Inc. v. John Zink Co., 736 F.2d 666, 221 USPQ 944 (Fed.Cir.1984). In defining the claimed word boost feature, the applicant directed the public to a circuit specifically disclosed in the specification, and also noted that equivalent circuits shown in prior publications would be found easily accessible to those skilled in the art. The claims were not indefinite.
 
 
 72
 4. Obviousness.
 
 
 73
 Samsung alleges that, in the light of prior art not cited to the examiner, the inventions in claims 6 and 7 of the '843 patent would have been obvious.
 
 
 74
 In rejecting this contention, the ALJ properly applied the criteria governing obviousness set forth in Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 693-694, 15 L.Ed.2d 545, 148 USPQ 459, 466-67 (1966). She made findings concerning the prior art, the differences between that art and the claims, and the level of ordinary skill in the art, noting that such experience in DRAM design was limited. ALJ Report at 451-53. The ALJ properly examined secondary considerations of nonobviousness, including the unexpected advantage of a reduction in the "soft error rate." ALJ Report at 454-55. Finally, the ALJ concluded:
 
 
 75
 Respondents have failed to show by clear and convincing evidence that the '500 and '843 patent claims, if narrowly construed, are invalid under 35 U.S.C. Sec. 103.
 
 
 76
 ALJ Report at 456. The limitation in the scope of the claim described was not necessary for her to reach this fully supported conclusion on obviousness. See part III-A-1.
 
 
 77
 The ALJ's findings relating to obviousness are supported by substantial evidence. The ALJ committed no legal error in finding that Samsung had not shown that the invention in the '843 patent would have been obvious to one of ordinary skill in the art. The Commission adopted the ALJ's findings and determination on this issue. ITC opin. at 46. We affirm.
 
 
 78
 C. The '500 Patent.
 
 
 79
 Samsung contends that the Commission erred in upholding the validity of the '500 patent and in reversing the ALJ's ruling that that patent was unenforceable. We find it unnecessary to decide those issues.
 
 
 80
 The Commission's exclusion order includes a bar on the importation of the Samsung DRAMs that infringe claims 6 or 7 of the '500 patent or the '843 patent. In part III-A, we reverse the Commission's determination that the 64K and 128K DRAMs do not infringe claims 6 or 7 of the '843 patent. (The Commission had held that only the 256K DRAM infringed.) The effect of our decision is that those claims of the '843 patent are valid and that the three Samsung DRAMs infringed them.
 
 
 81
 The Commission's exclusion order barred the importation of the infringing products "for the remaining terms of the patents." Both the '500 and the '843 patents expire on December 15, 1997, since Texas Instruments filed terminal disclaimers on those patents covering the portion of their terms following that date. Texas Instruments does not contend that there are any Samsung DRAMs that infringe claims 6 or 7 of the '500 patent that also do not infringe claims 6 or 7 of the '843 patent.
 
 
 82
 Accordingly, we need not consider the validity and enforceability of any claim of the '500 patent, since our decision regarding the '843 patent fully supports the exclusion order. We shall therefore vacate the Commission's determinations relating to the '500 patent.
 
 III
 Texas Instruments' Appeal in No. 1090
 
 83
 A. The '843 Patent.
 
 
 84
 The Commission, adopting the ALJ's determination, found that only the Samsung 256K DRAM, but not the 64K and 128K DRAMs, infringed claims 6 and 7 of the '843 patent. Texas Instruments challenges the Commission's ruling on the latter two DRAMs.
 
 
 85
 The ALJ based her finding of noninfringement on her interpretation of the following language in claims 6 and 7:
 
 
 86
 means for precharging the sense nodes to a selected voltage level prior to an active operating cycle.
 
 
 87
 The ALJ interpreted the words "selected voltage level" to mean "supply voltage level," and the words "means for precharging" to require use of an accessory circuit--so-called "equalization circuitry"--to accomplish the precharging. Since the Samsung 64K and 128K DRAMs concededly do not include either of those limitations as thus construed, the ALJ found that those DRAMs did not infringe claim 6 or 7 of the '843 patent.
 
 
 88
 We hold that the ALJ misconstrued both of those terms, and that she (and the Commission) erred in finding noninfringement by the Samsung 64K and 128K DRAMs.
 
 
 89
 1. The ALJ, after a careful examination of the prosecution history and the specification, held that the term "selected voltage" was intended to refer to a voltage that was not required to be the same voltage as the supply voltage, i.e., that it covered so-called "midpoint charging." The ALJ recognized that under this interpretation of the claims, Samsung's 64K and 128K DRAMs literally infringed the claims because those DRAMs had midpoint charging. She concluded that the literal construction of the claims rendered them invalid. To avoid invalidity, the ALJ construed the claims to cover only precharging to the "supply voltage level." She held that the Samsung 64K and 128K DRAMs did not infringe the claims as thus "proper[ly]" construed because "the Samsung 64K DRAM does not precharge the sense nodes on the column line (or the bit lines) to the supply voltage level." ALJ Report at 524.
 
 
 90
 The prosecution history of the patent explains the reason for inserting and the meaning of the words "selected voltage levels." The '843 patent application was a continuation of an application that also resulted in the issuance of the '500 patent and its parent patent, No. 4,239,993 (the '993 patent). Claim 1 of the '993 patent application specified
 
 
 91
 means for precharging the sense nodes to said voltage level prior to an active operating cycle.
 
 
 92
 '993 patent, column 6, lines 54-55. The "said voltage" referred to the "supply of given voltage level" in the immediately preceding clause. Column 6, line 53. This voltage is also termed the supply voltage, or Vdd. Though the supply voltage of then current models and the preferred embodiment was 5 volts (column 1, line 41, and column 2, line 44), the broad language of the claim shows that precharging would be to whatever specific voltage the supply voltage was.
 
 
 93
 After the application was filed, a company named MOSTEK began selling a DRAM with midpoint precharging. Rather than achieving equalization of the bit lines before reading by charging them to the supply voltage, Mostek used the Foss technique of charging the lines at a point about half way between ground and supply voltage. ALJ Report at 423. Seeking broader claim coverage that would reach this competing DRAM, Texas Instruments filed a new application that became the '843 patent, in which it substituted the words "selected voltage" for the prior words "said [supply] voltage." Texas Instruments told the examiner that "the '993 patent specification inherently disclosed midpoint sensing, even though it was not suggested in the embodiment in the specification." Id. The examiner did not object to the claims as interjecting "new matter."
 
 
 94
 The ALJ ruled that in thus amending the claims, Texas Instruments had added "new matter" not supported by the specification. To preserve the validity of the claim, the ALJ construed the amendment which changed "said voltage level" (supply voltage) to "selected voltage level" as limited to the supply voltage level. She stated:
 
 
 95
 The principal difference between the '500 patent and the '843 patent is that the '843 patent, read literally, does not require that the sense nodes or the column or bit line be precharged to the level of the supply voltage. The '843 patent, read literally, would cover midpoint charging or midpoint sensing devices, while the '500 patent would not.
 
 
 96
 Because of the evidence that this change from the wording of the '500 patent to the wording of the '843 patent added new matter that was not disclosed in the original grandparent application for the '993 patent filed in 1978, the claims of the '843 patent have been construed to cover only precharging to the supply voltage level....
 
 
 97
 The validity of the '843 patent claim is saved by claim construction. The only construction of the claim language that does not make the claims invalid for adding new matter is that the "selected level" of precharge is substantially the full power supply level.... Circuits that are precharged below substantially the full power supply level are not the same as or the equivalent of the disclosed circuit.
 
 
 98
 ALJ Report at 475-476.
 
 
 99
 Ambiguous claims, whenever possible, should be construed so as to preserve their validity. ACS Hosp. Systems, Inc. v. Montefiore Hosp., 732 F.2d 1572, 1577, 221 USPQ 929, 932 (Fed.Cir.1984). This rule of construction, however, does not justify reading into a claim a limitation that it does not contain and that the patentee deleted from the claim during prosecution. Cf. E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1434, 7 USPQ2d 1129, 1131 (Fed.Cir.1988).
 
 
 100
 Here Texas Instruments broadened the claim during prosecution to cover the competing MOSTEK DRAM. It is not "improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application." Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 874, 9 USPQ2d 1384, 1390 (Fed.Cir.1988).
 
 
 101
 It was not permissible for the ALJ, in order to preserve the validity of the claims, to rewrite them to add a limitation that the patentee had eliminated during prosecution, and then hold that the challenged devices (the Samsung 64K and 128K DRAMs) did not infringe the rewritten claims. The ALJ was of the view that claims 6 and 7 of the '843 patent were invalid because they contained "new matter"--a view we do not share--and she alternatively found the claims invalid. (See part II-B-2 for discussion of alternative finding.) We cannot, however, sustain the Commission's findings that the Samsung 64K and 128K DRAMs do not infringe claims 6 or 7 of the '843 patent because those DRAMs do not precharge to the supply voltage level.
 
 
 102
 2. The ALJ found that the Samsung 64K and 128K DRAMs did not infringe the '843 patent for the further reason that those DRAMs do not include the "means for precharging" specified in the patent. According to the ALJ, claims 6 and 7 require the use of "equalization circuitry"--an accessory circuit--to achieve the precharging, because that is the only means for precharging that the specification disclosed. The ALJ stated:
 
 
 103
 The two steps disclosed in the '843 patent specification require the use of a power supply to equalize the two sides of the bit line, followed by a pull-up of the bit line to a full power supply. The Samsung 64K DRAM shorts the bit lines together by means of transistors, so that the two bit lines share the same charge. It does not use a separate power supply to bring the level of the bit lines to the power supply level.
 
 
 104
 ALJ Report at 525.
 
 
 105
 The ALJ held, therefore, that "[p]recharge is then accomplished by two distinct steps, equalization followed by affirmative precharge." ALJ Report at 402.
 
 
 106
 Since the claims are written in means-plus-function form, we look to the specification to determine what are the "means for precharging" that the patent discloses. See 35 U.S.C. Sec. 112, p 6, which states that such claims "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." This provision
 
 
 107
 means exactly what it says: To determine whether the claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find the equivalent structure as well as identity of claimed function for that structure.
 
 
 108
 Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (in banc), cert. denied, --- U.S. ----, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988) (emphasis in original).
 
 
 109
 The specification described the precharging process in rather technical terms. As the ALJ explained it, the precharge portion of the cycle begins upon completion of the read or write cycle. First, equalization is achieved by shorting the bit lines together at a voltage near the ground voltage. "Next, the bit lines are precharged from the voltage supply. The bit lines are raised from near Vss or ground to a full Vdd power supply voltage. The clock voltage Psi applied to the gates of the precharge transistors 58 and 59 is boosted above Vdd to permit full Vdd bit line precharge." Id., citing '843 patent, spec. col. 5, ln. 66 to col. 6, ln. 2 (emphasis in original).
 
 
 110
 The structure disclosed in the '843 patent is, therefore, an accessory circuit attached at nodes which brings the voltage of the bit lines to the proper precharge. The function of this structure is to provide a stable and equal baseline voltage to the bit line prior to reading or writing.
 
 
 111
 The ALJ held that the 64K Samsung DRAM did not contain this structure and function. This was a factual finding which we review to determine whether substantial evidence supports it. We conclude that this finding does not have substantial evidentiary support.
 
 
 112
 The only evidence relating to this issue was the uncontradicted testimony of Samsung's expert, Joel Karp, which the ALJ did not question. His testimony shows that the precharging means of the Samsung 64K DRAM (and, necessarily, of the Samsung 128K DRAM) contains the same structure as the '843 patent described to perform the same function, namely, equalization followed by transistor mediated precharging.
 
 
 113
 Q: And so your point is that there is an equalization period followed by a precharge period?
 
 
 114
 Karp: Right.
 
 
 115
 Q: And in the 843 and 500 patents, that same sequence of events occurs, is that right?
 
 
 116
 Karp: Well, not that same sequence of events. Something similar to that. In the patent there is no method of equalizing the bit lines to a midpoint.
 
 
 117
 Trial Transcript at 12,941. Mr. Karp then more fully described the structure and function of the 64K added circuit, which maintains the precharge:
 
 
 118
 ... [I]t was basically to fix the problem that the device had where what they were doing was, they shorted all the bit lines together and got the thing sitting at the midpoint, but if they left, if they tried to operate the circuit in a mode which is called burst refresh, which means that the circuit is inactive for a long period of time, the circuit sometimes had a tendency to leak off, and so that it lost that charge.
 
 
 119
 ....
 
 
 120
 So it basically keeps that voltage once it is established, it keeps it there and doesn't let it leak off so that it is a very, very high resistance that doesn't really play a role in the setting of the voltage at all.
 
 
 121
 Trial Transcript at 12,948-49. Thus, Samsung could not build a DRAM with midpoint precharging of the bit lines without providing the claimed and disclosed accessory circuit of the '843 patent.
 
 
 122
 Samsung contends that the accessory circuit performs in a different way because the amount of current the circuit supplied is small in comparison to that of the '843 patent. The exact amount of current that passes in the "precharge means," however, is not a claim limitation. That current is, in fact, used in the 64K was admitted by Samsung's expert Karp. As Karp stated in a colloquy with the ALJ:
 
 
 123
 Karp: The line picks up the natural voltage created by all the charge sharing [during shorting of the bit lines together] and then there is sustaining action that occurs after that point to hold it at that potential.
 
 
 124
 Judge Saxon: I don't understand that. You mean LA just sustains it?
 
 
 125
 Karp: There is a circuit that keeps the voltage there, but it does not initially set the voltage.
 
 
 126
 Judge Saxon: That's electric, though, and it is putting power in?
 
 
 127
 Karp: To node LA, yes. [Emphasis added.]
 
 
 128
 Trial Transcript at 12,931.
 
 
 129
 The ALJ concluded that there was no "precharge means" in the 64K DRAM because, she found, "[i]t does not use a separate power supply to bring the level of the bit lines up to the power supply level." ALJ Report at 525. This finding is not supported by substantial evidence. It reflects her erroneous view that the bit lines must be brought to full power supply. Claims 6 and 7, however, literally cover midpoint precharging.
 
 
 130
 To meet this precharging limitation of the claims, a DRAM must have a circuit to satisfy the precharge means, but that circuit need not provide power to the extent of a full power supply. Under section 112, paragraph 6, the DRAM must have the equivalent structure which performs the identical function. Here, the evidence shows without contradiction that the 64K, and therefore the 128K, Samsung DRAMs both have a precharging circuit which feeds electrical power into the bit lines to establish precharged and equalized bit lines prior to the operating cycle.
 
 
 131
 The Commission adopted the ALJ's erroneous construction of the claims and her finding that the 64K and 128K DRAMs did not infringe. ITC opin. at 44-45. Since under the correct construction of the claims those DRAMs do infringe, we reverse those determinations and hold that the 64K and 128K Samsung DRAMs infringe claims 6 and 7 of the '843 patent.
 
 
 132
 B. The '764 Patent.
 
 
 133
 We find it unnecessary to reach Texas Instruments' contention that the Commission erred in reversing the ALJ's findings that the Samsung DRAM infringed claims 16, 17, and 19 of the '764 patent. In part II-A, we have upheld the Commission's determination that the '701 patent is valid and that the Samsung DRAMs infringed the claims of that patent here involved. As in the case of the '500 patent, Texas Instruments does not contend that there are Samsung DRAMs that would infringe only the '764 patent but not the '701 patent. The '701 patent expires in 1995, and the '764 patent expires in 1990.
 
 
 134
 The Commission's exclusion order is directed only to the Samsung DRAMs involved in this litigation and that order is sustainable on the basis of the '701 patent. There is thus no occasion for us to decide the question of infringement of the '764 patent. We shall therefore vacate the Commission's determination that the Samsung DRAMs do not infringe claims 16, 17, and 19 of the latter patent.CONCLUSION
 
 
 135
 The determinations of the Commission that Samsung has not shown that claims 1, 2, 3, and 6 of the '701 patent are invalid, that Samsung's DRAMs infringed those claims, and that the Samsung '256K DRAM infringed claims 6 and 7 of the '843 patent, are AFFIRMED.
 
 
 136
 The Commission's determination that the Samsung 64K and 128K DRAMs did not infringe the '843 patent is REVERSED.
 
 
 137
 The Commission's determinations that Samsung has not shown that claims 6 and 7 of the '500 patent are invalid, that the '500 patent is enforceable, that claims 4 or 5 of the '701 patent are infringed, and that Samsung DRAMs do not infringe the '764 patent, are VACATED.
 
 
 138
 The Commission's exclusion order is modified by deleting therefrom the reference to "claim ... 4, 5 ..." of the '701 patent, and to "claims 6 or 7 of U.S. Letters Patent No. 4,543,500."
 
 COSTS
 
 139
 No costs.
 
 
 140
 AFFIRMED IN PART, REVERSED IN PART, and VACATED IN PART.